

**FILED**
CLERK, U.S. DISTRICT COURT

May 28, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br>SHAUKAT A. CHOHAN and<br>MAHMOODA K. CHOHAN, )<br><br>Debtors. )<br>_____<br>A62 EQUITIES LLC, )<br>Appellant, )<br><br>v. )<br><br>SHAUKAT A. CHOHAN AND )<br>MAHMOODA K. CHOHAN, )<br><br>Appellees. ) | CASE NO. 8:14-cv-01192-SVW<br><br>ORDER AFFIRMING BANKRUPTCY<br>COURT'S ORDER<br><br><br>Bankruptcy No.: 8:14-bk-13606-SC |

**I.     INTRODUCTION**

This is an appeal from the Bankruptcy Court's July 24, 2014 Order Establishing

Scope of the Automatic Stay in Connection with Alleged Swap Agreement.  (8:14-bk-13606-SC

Dkt. 74.)  This appeal stems from an interest rate swap agreement between appellees Shaukat A.

Chohan and Mahmooda K. Chohan ("Debtors") and U.S. Bank, National Association (the

"Bank").  At the heart of this appeal are three intertwined questions: (1) what if any interest was

assigned to appellant A62 Equities, LLC ("A62"); (2) whether this assignment entitles A62 to

avail itself of the swap agreement exemption from the application of the automatic stay, 11

U.S.C. §§ 362(b)(17) & 560; and (3) whether A62 may collect such interest (if any exists) by

1   foreclosing on the subject trust deed.  The nebulous nature of the inquiry surrounding these

2   questions is confounded by the seemingly unique facts of this case, as well as the expedited

3   nature of the appealed from decision.

4          This case involves an alleged post-termination assignment of some interest related to a

5   terminated interest rate swap agreement.  A62, the alleged assignee, sought to foreclose on the

6   collateral used to secure the swap agreement after the defaulting party filed for bankruptcy.  The

7   parties fail to point to, and the Court has not found, any other case involving this set of facts.  As

8   such, this case apparently presents "a proving ground for interpreting, applying and testing the

9   boundaries" of the swap agreement exemption from the automatic stay.  *In re Lehman Bros.*

10  *Holdings Inc.*, 502 B.R. 383, 385 (Bankr. S.D.N.Y. 2013).  Because this is seemingly the first

11  time that the disputed statutory language is being interpreted and applied in this manner, the

12  Court anticipates that the current ruling may be controversial.  Nevertheless, it is unavoidable

13  that a case such as this involving sophisticated commercial transactions and complex underlying

14  financial structures "being analyzed for the first time from a real world bankruptcy perspective"

15  will occasionally "break new ground as to unsettled subject matter."  *In re Lehman Bros.*

16  *Holdings Inc.*, 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010) ("*BNY*").  For the reasons discussed

17  below, the Court AFFIRMS the Bankruptcy Court's July 24 Order.

18  **II.     FACTUAL[1] AND PROCEDURAL BACKGROUND**

19         On April 11, 2006, Debtors and the Bank entered into an interest rate swap agreement

20  comprised of an International Swap Dealers Association ("ISDA") Master Agreement and other

21  attached documents (collectively, the "Swap Agreement").[2]  (Appellant's Excerpts of Record

22

23  [1]   The court notes that while the Bankruptcy Court's Order did not include a formal summary of
    facts, the facts are largely undisputed.  The only relevant exceptions are the facts surrounding the
24  nature of the interest assigned to A62.  The Court therefore summarizes the parties' description of
    the underlying facts simply for clarity's sake.  In light of the fact that the Court does not here
25  make any factual determinations and because the parties do not raise any evidentiary objections to
    the excerpts of record, the Court bases this summary on Appellant's excerpts of record without
26  considering whether this evidence is admissible.

27  [2]   The Court notes that while Appellee characterizes the swap agreement as being comprised of
    the ISDA Master Agreement and a schedule, Appellant characterizes the Swap Agreement as also
28  including an April 19, 2006 confirmation letter.  Regardless, the parties do not argue over this
    distinction nor is it relevant to this Court's analysis.

("ER") 36–49, 51–61, 113–17.)  Pursuant to the Swap Agreement, Debtors also delivered to the Bank a cross-collateralization agreement.  (ER 60–61.)  The Cross-Collateralization Agreement provides that all of Debtors' obligations and liabilities to the Bank with respect to the Swap Agreement shall constitute "obligations" under the Debtors' existing and future loan and security agreements with the Bank.  (ER 60.)  The Cross-Collateralization Agreement further provides that "any Collateral pledged by such Borrower [Debtors] now or hereafter in favor of U.S. Bank or its affiliates in support of its obligations under the Loan Agreements shall also secure all of such Borrower's indebtedness, obligations and liabilities under the ISDA Master Agreement." (*Id.*)

Under the Swap Agreement, the Debtors agreed to pay to the Bank a fixed interest rate and the Bank agreed to pay to Debtors a floating interest rate.  (ER 113–14.)  Payments were to be calculated based on a notional amount[3] of $3,000,000.  (ER 113.)  The ISDA Master Agreement provides that the amount payable to the Bank was to be "netted" or offset against the amount payable to Debtors.  (ER 37.)  The Schedule to the Master Agreement specifies that the Agreement will be governed by and construed according to New York law.  (ER 55.)

The Swap Agreement includes a termination provision allowing for the termination of the swap agreement upon one of several defined "Events of Default."  (ER 41–43.)  Under Section 6 of the Master Agreement, if an Event of Default occurs, then the non-Defaulting Party may "by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."  (ER 41.)  Section 6(d) provides that "[a]n amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective[.]" ("termination damages"). (ER 42.)  Section 6(e) specifies methods for calculating the amount of termination damages to be paid.  (ER 42.)

The Agreement further states that "[w]ithout prejudice to Sections 2(a)(iii) and 6(c)(ii),

---

[3]  The "notional amount" in an interest rate swap agreement is a stand-in for the principal amount.  This amount never changes hands.  (Appellant's Opening Br. 2 n.1.)

the obligations of the parties under this Agreement will survive the termination of any

Transaction." (ER 44.) Section 6(c)(ii) provides that:

> [u]pon the occurrence or effective designation of an Early Termination
> Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in
> respect of the Terminated Transactions will be required to be made, but
> without prejudice to the other provisions of this Agreement. The amount, if
> any, payable in respect of an Early Termination Date shall be determined
> pursuant to Section 6(e).

(ER 42.) In relevant part, the Agreement defines "Terminated Transactions" as "with respect to

any Early Termination Date . . . (b) if resulting from an Event of Default, all Transactions (in

either case) in effect immediately before the effectiveness of the notice designating that Early

Termination Date[.]" (ER 48.)

Section 7 of the Master Agreement includes an anti-assignment clause. In relevant part,

Section 7 provides:

> Neither this Agreement nor any interest or obligation in or under this
> Agreement may be transferred (whether by way of security or otherwise) by
> either party without the prior written consent of the other party, except that:
> . . .
> (b) a party may make such a transfer of all or any part of its interest in any
> amount payable to it from a Defaulting Party under Section 6(e).
>
> Any purported transfer that is not in compliance with this Section will be
> void.

(ER 43.)

On May 26, 2006, roughly five weeks after signing the Swap Agreement, Debtors

obtained a loan from the Bank secured by a Trust Deed, Security Agreement, and Assignment of

Rents. (ER 31 ¶ 9.) On March 20, 2008, Debtors obtained a second loan from the Bank, also

secured by a Trust Deed, Security Agreement, and Assignment of Rents. (ER 31 ¶ 10.)

On June 8, 2012, the Bank sent to Debtors a letter notifying them that an Event of Default

had occurred and that the Bank was designating June 12, 2012 as the Early Termination Date.

(ER 31 ¶ 12.) On June 12, 2012, the Bank sent to Debtors a letter notifying them of the Early

Termination Amount of $527,384.59 payable to the Bank. (ER 63–65.) The Bank did not then

exercise any rights to collect under any security agreements; instead it added the Early

Termination Amount to the balance of the loan due by Debtors. (ER 31 ¶13.)

A62 asserts that on January 25, 2013, the Bank sold to A62 the May 26, 2006 and March

4

20, 2008 Trust Deeds, Security Agreements, and Assignments of Rents.  (ER 31 ¶ 13.)  A62 asserts that the Bank also assigned to it the Bank's interest in the Swap Agreement.  (Appellee's Rep. Br. 3.)  It is undisputed that Debtors did not consent to any such transfers from the Bank to A62.  (*Id.*)

On June 6, 2014, Debtors filed a Chapter 11 petition for bankruptcy.[4]  (ER 190.)  On July 3, 2014, Debtors moved for an Order Establishing Scope of the Automatic Stay in Connection with Secured Creditor's Alleged Swap Agreement and Pending Foreclosure Sale.  (ER 203.)  In their moving papers Debtors asserted that A62 intended to conduct a foreclosure sale of bankruptcy estate assets on July 16, 2014.  (ER 18.)  On July 7, 2014, the Bankruptcy Court agreed to hear Debtors' motion on an expedited basis.  (ER 204.)

On July 8, 2014, the Bankruptcy Court held a hearing regarding Debtors' motion.  (ER 205.)  At the hearing, the Bankruptcy Court accepted the parties' mutual representations that A62 was in fact the Bank's assignee.  (ER 163.)  The parties did not submit any documentary evidence of the assignment.  (*Id.*)  At the hearing, the parties argued over what was assigned to A62 and whether it became a swap agreement participant by virtue of the assignment.  (ER 149–82.)  The Bankruptcy Court ruled from the bench as follows:

> [A62] purchased the right to payment and that right to payment was secured by a deed of trust.  The deed of trust went along with the sale.  The Court doesn't have any of those documentations [sic] of assignment but is taking it as a representative of both parties that that assignment did occur.
>
> It's not a swap agreement.  You couldn't do it.  It's not happening.  It wasn't consented to by the debtor in this particular case and because of that—there may have been an assignment of a swap agreement, but it's invalid because there was no consent to it and, therefore the automatic stay applies.

(ER 182–83.)  On July 24, 2014, the Bankruptcy Court issued the a short Order stating that the Bankruptcy Court:

> having found that A62 did not acquire an interest in a swap agreement because the Debtors did not consent [sic] any alleged assignment, hereby Orders as follows:
>           1.  The motion is granted.

---

[4]  Though neither party focuses on this fact, the Court notes that Debtors filed their Chapter 11 petition four days before a foreclosure sale on the properties securing the subject Swap Agreement was scheduled to take place.  (ER 18 n.1.)

1           2.  The automatic stay provisions of 11 U.S.C. § 362(a) apply to
          A62's claims.
2               3.  A62's claims are not excepted from the provisions of the
          automatic stay under 11 U.S.C. § 362(b)(17).
3    (ER 145–46.)  On July 29, 2014, A62 appealed from the Bankruptcy Court's July 24 Order.

4    (Dkt. 1.)

5    **III.     STANDARD OF REVIEW**

6           A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of

7    laws are reviewed *de novo*.  *In re Clark*, 262 B.R. 508, 514 (9th Cir. BAP 2001).  "A lower

8    court's findings are reversible for clear error when the appellate court is left with a definite and

9    firm conviction that a mistake has been committed."  *Id.* at 514 (citing *United States v.*

10   *Maldonado*, 215 F.3d 1046, 1050 (9th Cir.2000), *cert. denied*, 531 U.S. 1172(2001)).  Mixed

11   questions of law and fact are generally reviewed *de novo*.  *Id.* (citing *Diamond v. City of Taft*,

12   215 F.3d 1052, 1055 (9th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001)).[5]

13   **IV.     DISCUSSION**

14          Section 362 of the Bankruptcy Code provides that the filing of a bankruptcy petition

15   triggers an automatic stay of, *inter alia*, actions to enforce a lien against estate property, actions

16   to enforce against the debtor's property a lien to the extent that it secures a claim that arose

17   before the bankruptcy, and actions to obtain possession or to exercise control over the estate's

18   property.  11 U.S.C. § 362(a).  Section 362 also stays the "setoff of any debt owing to the debtor

19   that arose before the commencement of the case under this title against any claim against the

20   debtor."  11 U.S.C. § 362(a)(7).  Courts have stated that the "automatic stay is the single most

21   important protection afforded to debtors by the Bankruptcy Code."  *Acands, Inc. v. Travelers*

22   *Cas. & Sur. Co.*, 435 F.3d 252, 258 (3d Cir. 2006) (quoting *In re Cavanaugh*, 271 B.R. 414, 424

23   (Bankr. D. Mass. 2001)) (internal quotation marks omitted).

24          Notwithstanding the importance of the automatic stay, Congress saw fit to exempt certain

25   actions from its grasp.  However, Courts must construe these exceptions narrowly.  *In re*

26

27   [5]   As a preliminary matter, the Court notes that the parties dispute the proper standard of review.
     However, although Debtors assert that the Bankruptcy Court's Order should be reviewed for
28   abuse of discretion, they admit that this Court reviews the Bankruptcy Court's factual findings for
     clear error and its conclusions of law *de novo*.

1  *Weisberg*, 136 F.3d 655, 659 (9th Cir. 1998).  Section 362(b)(17) provides an exemption for:

2      the exercise by a swap participant or financial participant of any contractual
3      right (as defined in section 560) under any security agreement or
    arrangement or other credit enhancement forming a part of or related to any
    swap agreement, or of any contractual right (as defined in section 560) to
4      offset or net out any termination value, payment amount, or other transfer
    obligation arising under or in connection with 1 or more such agreements,
5      including any master agreement for such agreements.

6  11 U.S.C. § 362(b)(17).  In relevant part, § 560 provides that:

7      [t]he exercise of any contractual right of any swap participant or financial
    participant to cause the liquidation, termination, or acceleration of one or
8      more swap agreements because of a condition of the kind specified in
    section 365(e)(1) of this title or to offset or net out any termination values or
9      payment amounts arising under or in connection with the termination,
    liquidation, or acceleration of one or more swap agreements shall not be
10     stayed, avoided, or otherwise limited by operation of any provision of this
    title or by order of a court or administrative agency in any proceeding under
11     this title.

12 11 U.S.C. § 560.  The Bankruptcy Code defines a "swap participant" as "an entity that, at any

13 time before the filing of the petition, has an outstanding swap agreement with the debtor."  11

14 U.S.C. § 101 (53C).  In relevant part, the Bankruptcy Code defines a "swap agreement" as "an

15 interest rate swap, option, future, or forward agreement" or "any security agreement or

16 arrangement. . . related to any [interest rate swap] . . . including any guarantee or reimbursement

17 obligation by or to a swap participant . . . . in connection with [an interest rate swap] . . . , but not

18 to exceed the damages in connection with any such agreement or transaction[.]"  11 U.S.C. §§

19 101(53B)(A)(i), (vi).

20       The parties to the current appeal focus on whether A62 is a "swap participant" under §

21 560 and if so, whether A62's foreclosure sale of the subject assets would be the exercise of a

22 contractual right to cause the "liquidation, termination, or acceleration" of a swap agreement.  As

23 discussed above, the Bankruptcy Court found that A62 purchased a right to receive payment

24 secured by a trust deed, not an interest in a swap agreement.  However, this right to receive

25 payment was derived from the Swap Agreement and was secured by a related security

26 agreement.  While the Swap Agreement was terminated before Debtors filed the instant

27 bankruptcy, their obligations related to the Terminated Transactions remained outstanding.

28 Thus, if the Bank hadn't assigned any interest related to the termination damages then Bank

7

1    would have arguably been a swap participant at the time Debtors filed for bankruptcy.  If so, the

2    question becomes whether this status was also conferred upon A62 by virtue of the alleged

3    assignment.  This question is complicated by the absence of the relevant assignment documents

4    from the record.[6]  This inquiry is also affected by the Swap Agreement's anti-assignment clause.[7]

5         The Bankruptcy Code's definitions of a "swap participant" and "swap agreement" are too

6    circular and ambiguous to provide the Court with sufficient guidance.  The Ninth Circuit has

7    previously defined a swap agreement as a "contract between two parties ('counterparties') to

8    exchange ('swap') cash flows at specified intervals, calculated by reference to an index." *Thrifty*

9    *Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003).  An

10   interest rate swap "obligates one counterparty to make payments equal to the interest which

11   would accrue on an agreed hypothetical principal amount ('notional amount'), during a given

12   period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the

13   interest which would accrue on the same notional amount, during the same period, but at a

14   floating interest rate." *Id.*

15        Undeniably, at the time that the Bank and Debtors entered the subject agreement, it was a

16   "swap agreement" within the meaning of the Bankruptcy Code.  Under the terms of the Master

17   Agreement and attached documents, the Bank and Debtors agreed to make periodic payments to

18   one another based on the interest that would accrue on a $3,000,000 notional amount, with the

19   Bank paying a floating interest rate and Debtors paying a fixed interest rate.  However, when the

20   Bank invoked its right to terminate the agreement early it ended any obligation that either party

21   to the Swap Agreement would have had with respect to future periodic payments to be calculated

22   after the Termination Date.  Though the Agreement provides that the Bank's and Debtors' rights

23   and obligations survive termination, these surving rights and obligations only involve past

---

[6]  For example, this might have been an easier case if the assignment documents clearly indicated that the Bank did not intend to assign any right it might have under § 362(b)(17) or under § 560 to avoid the automatic stay.

[7]  By applying it to the parties' motion, the Bankruptcy Court implicitly found this anti-assignment clause enforceable.  The Court AFFIRMS this finding. *See Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446, 451, 103 N.E.2d 891, 893 (1952) (finding enforceable a "clear, definite" anti-assignment provision that provided that any attempted assignment of a contract or rights created under it would be "void").

transactions—i.e. those periodic payments which were already calculated, had become due, and were still outstanding as of the time of termination. The Bank calculated the amount of termination damages to be paid and notified the Debtors of such amount. Thus, the parties' only remaining rights and obligations at the time of the Bank's alleged assignment were Bank's right to collect (and Debtors' obligation to pay) the specified termination damages amount. Therefore, at the time of the Bank's alleged assignment, the only right that the Bank could assign was its right to collect termination damages from Debtors (which was secured by the Trust Deeds). Moreover, as the Bankruptcy Court recognized, because it is undisputed that Debtors did not consent to the Bank's alleged assignment to A62, the Agreement prevented the Bank from transferring anything other than "all or any part of its interest in" termination damages owed to it by Debtors. Thus, the Bankruptcy Court correctly found that the Bank assigned to A62 only the right to payment and not an interest in a swap agreement. However, that is not the end of the inquiry.

A62 argues that as the Bank's assignee, it stands in the Bank's shoes; thus if the Bank was a swap participant for purposes of § 560 then so is A62. Under basic principles of contract law, A62 is correct that an assignee stands in the shoes of the assignor. *See In re Enron Corp.*, 379 B.R. 425, 435 (S.D.N.Y. 2007). However, this doesn't answer the question of how to characterize the right assigned. In other words, this finding does not address whether, as part of its assignment of the right to payment, then Bank also assigned its right to avail itself of § 560's exemption from the automatic stay (assuming that the Bank had such a right). If the Bank's interest in the termination damages also included the right to collect on the debt by foreclosure sale, irrespective of the automatic stay,[8] then the Swap Agreement arguably allowed the Bank to

---

[8]  The Court notes that it is not clear that the Bank would have the right to foreclose on the subject properties irrespective of the automatic stay. The Bankruptcy Code's "swap agreement" definition includes a security agreement related to an interest rate swap. *See* 11 U.S.C. § 101(53B)(A)(vi). Moreover, § 362(b)(17) exempts from the automatic stay the exercise of a contractual right under a security agreement related to a swap agreement or a contractual right to offset or net out any "termination value, payment amount, or other transfer obligation" arising in connection with a swap agreement. 11 U.S.C. § 362(b)(17). Finally, § 560 exempts the "liquidation, termination, or acceleration" of a swap agreement (including a related security agreement) from the automatic stay. 11 U.S.C. § 560. Moreover, the Bank was originally a swap participant and, but for the assignment, would have had an outstanding right to receive payment of

1    assign without Debtors' consent its entitlement to invoke § 560—i.e. to assign its "swap

2    participant" status.  Here, the Bankruptcy Court did not expressly consider whether the assigned

3    right to payment included a right to invoke the swap agreement exemption from the automatic

4    stay.  However, it implicitly found that whatever interest was assigned did not include the right

5    to invoke § 560.  As discussed below, the Court finds as a matter of law that even if the Bank

6    had a right to institute a foreclosure sale on the subject properties irrespective of the automatic

7    stay, it could not assign to A62 its right to be considered a "swap participant"[9] for purposes of §§

8    560 or 362(b)(17).

9           When a statute is plan and unambiguous face, Courts ordinarily do not look to the

10   legislative history.  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Nothing in the

11   language of § 560 or of § 362(b)(17) addresses whether one may become a "swap participant"

12   entitled to invoke the swap agreement exemption by virtue of an assignment.  The Oxford

13   English Dictionary defines a "participant" as, *inter alia*, "[a] person who participates in

14   something; a person who experiences something in common with others; a partaker, a sharer; a

15   participator."  *Oxford English Dictionary* (3d ed. 2005), *available at*

16   http://www.oed.com/view/Entry/138242?redirectedFrom=participant#eid.  Thus, relying on

17   common vernacular, a "swap participant" might mean either one who participates in a swap

18   agreement by signing it or one who partakes in the agreement by exercising rights conferred

19   thereunder.

20   _____

21   termination damages (secured by the Trust Deeds) at the time Debtors filed for bankruptcy.  Thus,
     the Bank arguably would have been a swap participant and arguably could have liquidated the

22   collateral securing the Swap Agreement.  However, as the Bankruptcy Court recognized, it is not
     certain that the Bank would have been a swap participant at the time the instant bankruptcy was

23   filed—the relevant timer period for purposes of the Bankruptcy Code—under the facts of this
     case.  *See* (ER 160:10–162:20.)  Additionally, at least one author has stated that a protected party

24   seeking to sell property held as a collateral securing a swap agreement may be required to seek an
     order from the bankruptcy court directing the debtor to act if the collateral remains in the debtor's

25   possession or if his cooperation is otherwise required.  5-560 *Collier on Bankruptcy* ¶ 560.04.
     Admittedly, if the Bank did not have the right to foreclose on the subject property irrespective of

26   the automatic stay it could not have assigned such a right to A62.  Nevertheless, the Court
     assumes *arguendo* that the Bank had such a right.

27

28   [9]  In the instant appeal, the parties do not raise the issue of whether A62 is a "financial
     participant."  Accordingly, the Court does not address this question.  *See Rizk v. Holder*, 629 F.3d
     1083, 1091 n. 3 (9th Cir.2011) (issues not raised in an opening brief are waived).

Where the language of a statute is unclear, the Court may look to the statute's legislative history for guidance. *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981). Section 560 was added to the Bankruptcy Code in 1990. 5-560 *Collier on Bankruptcy* ¶ 560.LH. The legislative history of § 560 indicates that Congress was concerned with minimizing volatility in financial markets**.** H.R. Rep. 101-484, at 2 (1990). Congress recognized that swap were being used more frequently by entities seeking to minimize borrowing costs and to hedge against interest and exchange rate fluctuations. *Id.* at 2–3. Congress further recognized that the uncertainty regarding such agreements' treatment under the Bankruptcy Code caused concern regarding volatility in swap agreement markets. *Id.* Congress noted that:

> [c]oncerns have been raised that under current bankruptcy law, termination and setoff of a swap agreement would be automatically stayed when one of the parties files a bankruptcy petition, whereupon the trustee, after indefinitely postponing termination of the swap agreement, could refuse setoff and unfairly 'cherry pick' only the portions of the agreement advantageous to the debtor, while rejecting the portions unfavorable to the debtor.

*Id.* at 3. Section 560 was intended "to permit either the non-debtor swap participant or the trustee to terminate a swap agreement, so that a swap agreement may continue after the bankruptcy petition is filed only by mutual consent of both the non-debtor swap participant and the trustee." *Id.* at 6.

This legislative history "reflects a concern for the stability of the often-volatile swap market. Consequently, Congress emphasized that the Safe Harbor Provisions permit immediate termination of swap transactions in order to minimize the non-bankrupt counterparty's exposure to such unpredictability." *In re Lehman Bros. Holdings Inc.*, 445 B.R. 130, 135 (S.D.N.Y. 2011) (*Swedbank*). The legislative history also indicates that the intent of § 560 was to allow swap participants to terminate swap agreement transactions; it does not extend to the "general commercial obligations of parties to swap agreements."

The foregoing illustrates that Congress passed the swap agreement safe harbor in order to safeguard against two particular kinds of risk—(1) the risk that the non-bankrupt would face from volatility in the swap market if it could not readily terminate the swap agreement, and (2) the risk that the non-bankrupt would be prejudiced by the debtor cherry-picking only the self-

1    serving portions of the agreement and avoiding the rest.  Sections 362(b)(17) and 560 serve this

2    purpose by ensuring that the filing of a bankruptcy will not prevent a swap participant from

3    immediately terminating, accelerating, and liquidating a swap agreement.  Thus, these sections

4    eliminate the risk that a swap participant will remain locked into an unfavorable swap agreement

5    while interest rates move in the debtor's favor.

6         However different considerations are raised where the non-defaulting party to a swap

7    agreement exercises its right to terminate and liquidate the agreement, determines the amount of

8    termination damages due, and then assigns its interest in the termination damages to a third

9    party.  Once the swap agreement is terminated and the amount of termination damages is

10   calculated, there is no longer a risk of ongoing and mounting harm from interest rate changes.

11   Instead, the primary risk posed by an interest in termination damages is the risk of

12   default—which is then a sum certain.  Thus, when an assignee agrees to the post-termination

13   assignment of a non-defaulting party's interest in a specified termination damages sum, the

14   assignee can determine *ex ante* the magnitude of risk that it faces.  This is very different than the

15   uncertainty and potentially limitless risk that would be faced by a party entering an interest rate

16   swap if an automatic bankruptcy stay could lock that party into a swap agreement with a party

17   that had declared bankruptcy.

18        In essence, allowing an assignee to qualify as a swap participant for purposes of § 560

19   under the circumstances of this case would serve the purpose of protecting the assignee from the

20   risk of counterparty default rather than from the risk of volatility.  Moreover, any risk that the

21   assignor faced from its interest in the swap agreement is terminated upon assignment.  Thus, the

22   Congressional intent animating § 560 would not be served by allowing an assignee such as A62,

23   under the circumstances of this case, to qualify as a "swap participant."

24        Additionally, the Court notes that A62's proposed rule entitling it to invoke § 560 as a

25   "swap participant" by virtue of the Bank's assignment would create a substantial risk of

26   arbitrage.  In essence, any entity would be able to accumulate "super-priority" debt by

27   speculatively obtaining assignments of interests in swap agreement termination damages.  *Cf.*

28   *Swedbank*, 445 B.R. at 137 ("Finally, if we were to accept Swedbank's argument, we would be

1    obliged to conclude that a swap participant is entitled to a super-priority status that extends to all
2    of its commercial transactions with the debtor. Congress neither wrote a statute that created this
3    de facto super-priority status nor did Congress intend to do so."). The facilitation and
4    encouragement of such a market would not serve Congress's interest in protecting the innovate
5    use of swap agreements to hedge against interest rate risk.

6              Assuming *arguendo* that the Bank would be able to foreclose on the subject properties
7    notwithstanding the automatic stay if it hadn't assigned its interest, this rule would admittedly
8    treat an assignor and assignee differently. It thus risks creating a somewhat inconsistent regime.
9    Nevertheless, when consistency would be foolish this interest must yield to more pressing
10   concerns. Here, the protections afforded to the bankrupt by the automatic stay are crucial; the
11   swap agreement exemption is a carve-out from this protection. The exemption meant to serve a
12   competing interest which Congress apparently found overriding in this circumstance. As other
13   courts have recognized, exceptions to the automatic stay should be construed narrowly. Thus, in
14   a case such as this, it is more important to ensure that the automatic stay remains strong and the
15   exception thereto remains canalized than to ensure that the law yields perfectly symmetrical
16   results.

17

18

19

20

21

22

23

24   ///
25   ///
26   ///

27

28

**V.      CONCLUSION**

For the aforementioned reasons, the Court AFFIRMS the Bankruptcy Court's July 24 Order holding that A62's claims are not excepted from the automatic stay.[10]


**IT IS SO ORDERED.**


Dated: May 28, 2015

_____
        STEPHEN V. WILSON
      United States District Judge

---

[10]   In light of this finding, the Court need not reach the parties' other arguments.

14